# 2009 DTA 98

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL V**

FLOR E. GONZÁLEZ SERRANO
Apelante-Recurrente

v.

ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO DE LOS
EMPLEADOS DEL GOBIERNO Y LA JUDICATURA
Apelada-Recurrida

Núm. KLRA-2009-00345

San Juan, Puerto Rico, a 3 de julio de 2009

Panel integrado por su Presidente, el Juez Arbona Lago,
el Juez Salas Soler y la Juez Cotto Vives

Cotto Vives, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Inconforme con la determinación arribada en su caso por la Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura, la señora Flor E. González Serrano nos solicita que la revoquemos. La resolución que se cuestiona fue tomada por la Junta de Síndicos de la referida agencia, el 9 de diciembre de 2008, la que a su vez fue notificada el 14 de enero de 2009. En ésta se confirmó una determinación de la Administración de los Sistemas de Retiro de denegarle a la recurrente una pensión por incapacidad ocupacional.

La recurrente aduce que se equivocó dicha Junta al concluir que la señora González Serrano no está total y permanentemente incapacitada para realizar las labores de su trabajo o cualquier otro que se le pudiese asignar, aun considerando la totalidad de la evidencia que obra en el expediente administrativo.

En atención a los fundamentos que expondremos a continuación, se confirma la resolución recurrida.

### I

Tal cual surge del récord ante este Tribunal, la relación de hechos es la siguiente. La señora González Serrano se desempeñaba como Auxiliar de Sistemas de Oficina en el Departamento de la Familia. Departamento en el que laboró por espacio de 2.50 años. Ésta sufrió tres accidentes del trabajo. El primero de ellos ocurrió el 19 de enero de 2001, (caso núm. 01-07-02572-7; el segundo, el 18 de septiembre de 2001, (caso núm. 02-07-01028-6) y, el tercero, el 16 de octubre de 2002, (caso núm. 03-07-01245-9).

Como consecuencia de su precario estado de salud, el 20 de mayo de 2003, la recurrente presentó una solicitud de incapacidad ante la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura. Su petición fue denegada el 11 de mayo de 2005. En desacuerdo con la decisión tomada en su caso, la recurrente acudió ante la Junta de Síndicos de esa agencia, mediante escrito presentado el 27 de mayo de 2005. En esa etapa, la recurrente presentó evidencia médica adicional relacionada con una nueva condición de salud relacionada con el empleo. Por ello, solicitó que el caso se remitiera a la Administración para que se evaluara la nueva evidencia médica. El representante legal de la agencia no se opuso a la devolución del caso.

Luego de evaluar la nueva evidencia médica, la Administración se reafirmó en la denegatoria de beneficios. Así las cosas, la recurrente volvió ante la Junta de Síndicos. Efectuados los trámites legales de rigor, la vista del caso se celebró el 11 de agosto de 2008. En esa ocasión, sólo prestó testimonio la señora González Serrano. La Junta de Síndicos, según ya dijimos, confirmó la acción tomada por la agencia. Ello conllevó que la recurrente presentara el recurso de autos.

En su escrito ante este Tribunal, la señora González Serrano hace una relación de todas las condiciones médicas que padece y asegura que siente mucho dolor en el área del cuello y la espalda. Argumenta que no tiene la fuerza que tenía anteriormente en su brazo derecho, así como tampoco lo puede extender completamente. Alega que esa condición le ha causado mucha depresión porque no puede hacer muchas de las cosas que antes podía realizar, como por ejemplo; conducir vehículos de motor, ni realizar las labores de limpieza en su hogar. Como secuela de ello, tiene que tomar medicamentos constantemente. En relación con la condición de la espalda, señala que no puede estar mucho tiempo de pie, ni sentada debido al dolor que ambas posiciones le producen. Además, alega que sufre problemas de inflamación en las rodillas y que tiene una fractura en el pie izquierdo. Todos estos padecimientos le han provocado una condición emocional que conlleva el que tenga que recibir tratamiento siquiátrico.

En su recurso, la recurrente se queja de que la determinación en su caso está basada en el análisis que realizaron los médicos evaluadores de la agencia, en vista a los informes médicos que ésta presentó; sin embargo, —al hacer dicha evaluación—, no se le dio mayor consideración a los informes médicos preparados por los doctores que la trataron, los cuales deben tener mayor peso y valor probatorio. Siendo así, considera que las evaluaciones médicas en el récord, así como el testimonio presentado el día de la vista, es concluyente de que —al considerar en conjunto sus limitaciones físicas y emocionales—, no está capacitada para realizar sus funciones.

## II

En esencia, el error señalado por la recurrente va dirigido a cuestionar la apreciación de la prueba que tuvo ante sí la agencia recurrida, así como en su interpretación de la Ley 447 de 15 de mayo de 1951, según enmendada, 3 L.P.R.A. secs. 761 *et seq.*, y el Reglamento General para la Concesión de Pensiones, Beneficios y Derechos a los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades, Núm. 4930 de 26 de mayo de 1993, enmendado posteriormente por el Reglamento 6719 de 7 de noviembre de 2003. Primero, presentaremos los principios generales aplicables a la revisión judicial de las determinaciones de las agencias administrativas.

Como se sabe, la revisión judicial de las decisiones administrativas comprende tres aspectos: (1) la concesión del remedio apropiado, (2) las determinaciones de hechos, y (3) las conclusiones de derecho del organismo administrativo. De ordinario, los tribunales le confieren deferencia, tanto a las determinaciones de hechos que emiten las agencias administrativas, como a sus interpretaciones de las leyes cuya administración les ha sido encomendada. Sin embargo, éstas no puede ser "pro forma". Es decir, la agencia no puede limitarse a recitar o a repetir frases generales que aparecen en sus reglamentos o en su ley orgánica como único fundamento para su decisión. *Padín v. Retiro*, 172 D.P.R. ___ (2007), **2007 J.T.S. 151**.

En cuanto a este aspecto, el Tribunal Supremo ha expuesto que "los tribunales no están llamados a imprimir un sello de corrección, so pretexto de la deferencia, para avalar situaciones en que la interpretación efectuada resulta contraria a derecho." *Padín v. Retiro, supra.* Por ello, el referido foro ha resuelto que *la norma de impartir deferencia a la interpretación que hace una agencia administrativa del estatuto o reglamento que está ante su administración es una de hermenéutica que de ningún modo afecta el alcance de la facultad de revisión de los tribunales. Padín v. Retiro, supra.*

La Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme, Ley 170 de 12 de agosto de 1988, 3 L.P.R.A. sec. 2175, dispone lo siguiente acerca del alcance de la revisión judicial de las decisiones administrativas:

"El Tribunal podrá conceder el remedio apropiado si determina que el peticionario tiene derecho a un remedio.

*Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo.* Las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal." (Énfasis suplido.)

Se sabe que evidencia sustancial es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. Debido a que las determinaciones del foro administrativo tienen que basarse en evidencia sustancial, *la parte que las impugne tiene que convencer al tribunal de que la evidencia en la cual se apoyó la agencia para formular tales determinaciones no es sustancial.* Si la parte afectada, en la solicitud de revisión, no demuestra la existencia de esa otra prueba que sostiene que la actuación de la agencia no está basada en evidencia sustancial o que reduzca el valor de la evidencia impugnada, el tribunal respetará las determinaciones de hechos y no deberá sustituir el criterio de la agencia por el suyo. *Otero v. Toyota,* 163 D.P.R. 716 (2005). *Conforme con lo anterior, es norma trillada que la agencia administrativa debe evaluar la prueba que tiene ante sí en su totalidad, incluyendo aquella que sostenga la decisión de la agencia, así como la que reduzca o menoscabe el peso de la prueba que fue considerada por la agencia. Padín v. Retiro, supra.* De hecho, el Tribunal Supremo ha sostenido que *tanto la apreciación arbitraria de la prueba por parte del organismo administrativo, como la determinación sobre si las conclusiones de hecho que sirven de base a su decisión están sostenidas por evidencia sustancial, constituyen una cuestión de derecho. Padín v. Retiro, supra.*

De otra parte, como regla general, un dictamen de una agencia administrativa constituye un abuso de discreción cuando es arbitrario y caprichoso. Esto es, si la agencia descansó en factores que la Rama Legislativa no intentó considerar, *si no considera un aspecto importante de la controversia u ofrece una explicación para su decisión que contradice la evidencia presentada ante la agencia,* o si formula una conclusión de derecho que es tan poco plausible que no pueda ser interpretada, de esa forma, como producto de la especialización de la agencia. *Padín v. Retiro, supra.*

En resumen, siempre y cuando estén sustentadas por evidencia sustancial que obre en el récord administrativo, las determinaciones de hechos formuladas por la agencia serán sostenidas. El foro judicial sólo podrá sustituir el criterio de la agencia por el propio en aquellas ocasiones que no encuentre una base racional que fundamente la actuación administrativa. *Asociación v. Junta Planificación,* 171 D.P.R. ___ (2007), **2007 J.T.S. 146**.

Una vez establecido lo anterior, debemos dilucidar si la determinación de denegar la pensión por incapacidad ocupacional solicitada por la señora González Serrano está sostenida por la evidencia médica que tuvo ante sí la agencia recurrida en el recurso de epígrafe. Por tanto, procede que analicemos si en el caso de autos la Junta de Síndicos de la Administración de los Sistemas de Retiro basó la resolución recurrida en evidencia sustancial que obra en el expediente administrativo o si, por el contrario, actuó arbitraria o ilegalmente, o en forma tan irrazonable que su actuación constituyó un abuso de discreción. *Rebollo v. Yiyi Motors,* 161 D.P.R. 69 (2004). La Ley 447 de 15 de mayo de 1951, antes citada, creó un sistema de retiro para los empleados de gobierno y la judicatura de Puerto Rico. Esta ley también establece las circunstancias bajo las cuales un participante del sistema puede ser acreedor a los beneficios de una pensión por incapacidad ocupacional o no ocupacional. A estos efectos, el Art. 9 de la citada ley, 3 L.P.R.A. sec. 769, dispone que todo participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional.

Para ello, el participante debe presentar suficiente prueba médica en cuanto a la alegada incapacidad mental o física, *conforme a los criterios que mediante reglamento fije el Administrador*. Además, tiene que notificarle al Administrador con respecto a dicha incapacidad y el Fondo del Seguro del Estado debe determinar que el accidente o enfermedad provino de cualquier función del trabajo o que sea inherentemente relacionado al trabajo o empleo. Art. 9 de la Ley 447, *supra*.

Por su parte, el Art. 11 de la Ley 447, 3 L.P.R.A. sec. 771, también establece que a los fines de recibir los beneficios de retiro por incapacidad ocupacional o no ocupacional, se considerará incapacitado a un participante cuando la incapacidad esté sustentada con suficiente prueba médica, *conforme a los criterios que mediante reglamento fije el Administrador*, y *dicha prueba revele que el participante está imposibilitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado*. Si el Administrador lo cree conveniente, podrá requerirle al participante que se someta a exámenes adicionales con médicos seleccionados por el Administrador.

Con el propósito de implantar las leyes que conceden pensiones, beneficios y derechos, así como definir y regular los procedimientos y prácticas para la concesión de éstos, la Administración de los Sistemas de Retiro aprobó el Reglamento General para la Concesión de Pensiones, Beneficios y Derechos a los Empleados del Gobierno de Puerto Rico y sus Instrumentalidades, Núm. 4930 de 26 de mayo de 1993, enmendado posteriormente por el Reglamento 6719 de 7 de noviembre de 2003.

La Regla 24.4 del citado Reglamento 4930 dispone que si de la evidencia médica que consta en el expediente y conforme al *listado de criterios médicos* ("Adult Listings") establecidos para determinar incapacidad y del análisis e investigación que realicen los técnicos en determinación de incapacidad designados por el Administrador, no se pudiese determinar con certeza la incapacidad, se le podrá requerir al participante que se someta a aquellos exámenes médicos adicionales que se entiendan necesarios para adjudicar en sus méritos la petición de beneficios por incapacidad. Además, reitera que se considerará capacitado al participante, si no está total y permanentemente incapacitado e imposibilitado *para cumplir los deberes de cualquier cargo que su patrono le hubiere asignado o para trabajar en cualquier empleo retribuido, con un sueldo o retribución por lo menos igual a la que esté percibiendo*.

El listado de criterios médicos mencionado anteriormente fue establecido en el Manual para la Evaluación de Incapacidad, Apéndice I del Reglamento 4930. En éste se define "incapacidad", para propósitos de la Administración de Sistemas de Retiro, de la siguiente manera:

"Se considerara incapacitado a un participante, **cuando la incapacidad esté sustentada con suficiente prueba médica,** *conforme a los criterios aquí establecidos*, que revele que el participante está **imposibilitado para cumplir los deberes de cualquier cargo** que en el servicio del patrono se le hubiere asignado. Dicha imposibilidad deberá durar un período no menor de doce (12) meses.

Se considerará una incapacidad como total y permanente, cuando las condiciones que lo incapacitan sean de tal naturaleza, *que no se espere recuperación alguna*." (Énfasis suplido.)

De otro lado, el inciso 6 del Art. 5 del Reglamento 6719, *supra*, define "incapacidad", como la inhabilidad e imposibilidad del participante para cumplir los deberes de *cualquier cargo* que en el servicio del patrono se le hubiere asignado, conforme a los criterios médicos establecidos por el Administrador en el Manual para la Evaluación de Incapacidad de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura, *supra*. El inciso 7, por su parte, establece que la "incapacidad total y permanente" sobreviene cuando la condición médica del participante es de tal naturaleza, *que no se espera recuperación alguna*, conforme los criterios médicos establecidos por el Administrador en el referido Manual.

Nótese que tanto la Ley 447, *supra*, como el Reglamento 4930, *supra, condicionan la determinación de incapacidad en cada caso al hecho de que la evidencia médica que obre en el expediente demuestre que en ese caso particular están presentes los criterios médicos establecidos en el Manual para la Evaluación de Incapacidad, conforme a los padecimientos médicos de cada participante.*

En el caso de autos, la recurrente señala que la agencia recurrida no reconoció en su informe las limitaciones de movimiento que le producen a la recurrente sus condiciones orgánicas y que tampoco tuvo en consideración el severo dolor que éstas le causan. No tiene razón. Tanto la Administración de los Sistemas de Retiro, como la Junta de Síndicos, tuvieron la oportunidad de examinar los informes preparados por los especialistas médicos que han evaluado a la señora González Serrano desde el momento en que sufrió el primer accidente laboral, así como la evidencia médica de los siguientes accidentes relacionados con su trabajo, todos los cuales la llevaron a solicitar los beneficios que concede la Ley 447, *supra*. Entre dichos documentos se encuentran los siguientes, según mencionados por la Junta de Síndicos en el dictamen recurrido:

"1. Expediente médico del Fondo del Seguro del Estado.

2. Mammography bilateral: Impression: "Fibrocystic changes. Dominant right breast simple cysts. Benign findings."

3. Pathological Diagnosis Right Breast 6-20-01: "Fibrocystic changes, moderate profilerative type with cysts, aprocrine metaplasma, intraductal ectasia, fribrosing and sclerosing adenosis, microcalcifications and ductal epithelial hyperplasia."

4. MRI of the lumbar spine 2-20-02: Impression: "Essentially normal study except for minimal bulging of the annulus fibrosis around L5-S1."

5. Informe radiográfico 10-18-02: Right hip: "Normal report. Right ankle: Normal report."

6. MRI of the right shoulder 10-23-02: Impression: "Findings consistent with proximal humeral fracture with slight inferior displacement of the fragment of greater humeral tubercle area."

7. Informe radiográfico 11-21-02: "Right shoulder: The images appear to demonstrate fracture of the humeral head involving the greater tuberosity. Right humerus: The images appear to demonstrate fracture of the humeral head involving the greater tuberosity".

8. Informe radiográfico 11-22-02: "CT of the lumbar spine: Suspected small central disc protrusion L5-S1."

9. MRI of the right knee 11-26-02: Impression: "Small knee Joint effusion."

10. Bone Scan 11-29-02: "The area of increased uptake in the proximal right humerus is compatible with a fracture in this region. The areas of increased uptake in both sternoclavicular joints most likely area secondary to arthritis.

11. Informe radiográfico 22-1-03: Right shoulder. Images suggest the presence of a line across the greater tuberosity of the humerus suggestive of a fracture."

12. Informe médico 1-24-03: Sistema motor: Normal. Sistema sensorial: Normal. Reflejos: Bilateral adecuados. Ataxia: No evidencia. Ninguna fractura. Diagnóstico: Contusión cérvico dorsal. Prognosis: Buena.

13. Informe médico 28-12-03 Dra. Elba González Bauzá: Restricciones: Todo trabajo que implique

movimientos a nivel articulación gleno humeral derecho, empujar, levantar, elevar. Además rotación articulación. Mejoría que se anticipa: Mejorar el movimiento y disminución del dolor lo cual no se ha conseguido. Sistema sensorial: Presentes. Reflejos: Presentes. Limitaciones de movimiento: Elevación hombro derecho. Condición mental: Depresión. Diagnóstico: Relacionadas al trabajo: S/P hombro derecho, contusión mano derecha, esguince lumbosacral y HNP L5-S1, contusión cadera derecha, contusión rodilla y tobillo derecho. No relacionados al trabajo: HBP miocardiopatía, hiperlipidemias, hígado graso, s/p extirpación masa mamaria derecha, útero fibróstico con quistes, metrorragia. Prognosis: Reservado.

14. Notas de progreso 6-24-04: Paciente refiere persiste dolor y disminución de arco de movimiento en hombro derecho que le limita en algunas de sus actividades del diario vivir. Objetivo: Paciente ambula de forma adecuada. Presente leve-moderada inflamación en hombro derecho área del deltoide. El ROM en hombro derecho es de 75 grados flexión, 60 abducción, 20 abducción y 15 extensión. Metas: Modular dolor a leve. Aumento ROM a 120 grados.

15. Revisión médica del expediente efectuada por la Dra. Yarima Marcucci, Asesor Médico de la ASR, del 4-22-05: Comentarios: "Se determina que no llena ni iguala criterios 1.11, 1.12, 1.13 ni 2.06 para IO. Se recomienda denegar.

16. Informe radiográficos cervical y lumbar 2-21-06: Cervical: "There is straightening of the vertebral bodies of the cervical spine most likely secondary muscle spasm. Degenerative hypertrophic spondylotic changes seen C4-C5 and to lesser extend C5-C6. The prevertebral soft tissues are normal. The C7-T1 intervertebral space is not well visualized. Therefore pathology cannot be entirely excluded. Lumbosacral spine: A left transitional vertebra is seen at L4-S1. No evidence of acute fracture of subluxation. Mild hypertrophic spondylotic changes seen at L3-L4."

17. Notas de progreso de Clínica de Salud y Belleza, Sabana Hoyos.

18. Musculoskeletal Medical Report Dr. Israel Avilés, Fisiatra, 10-3-06: "Muscle strength: Upper extremities 4/5 right, Left 5/5, Handgrip Right 4/5; left 5/5. Lower extremities 5/5 right and left. Normal gait. No assistance device. Reflexes: Biceps and triceps: 2 right and left. Patellar 2 right and left. Achilles: Right 0, Left 1. Severe muscle spasm located at cervico doersal y lumbosacral. Severe decreased in right shoulder ROM. Diagnosis: Adherive capsulities right shoulder, cervico dorsal lumbosacral myositis with L5-S1 HNP. Prognosis: Poor."

19. Evaluación Ortopédica Dr. César Cintrón Valle 1-5-07: Queja principal: Dolor en el hombro derecho. En el año 2002, la Sra. González sufrió un accidente de trabajo cuando se desempeñaba como secretaria para el Departamento de la Familia. Atravesando un pasillo se cayó traumatizándose el hombro derecho contra una columna. Sufrió fractura del húmero. Fue llevada a Sala de Regencia (sic) del Hospital Regional de Arecibo, donde se le hizo estudios de radiología y se le redujo dislocación del hombro derecho bajo anestesia general. Fue referida al Dr. Rodríguez, Cirujano Ortopeda de Arecibo, quien de (sic) le indicó terapia física. Un mes más tarde fue referida al Dr. Luiggi, Cirujano Ortopeda, quien le siguió como paciente de clínicas externas. Fue referida al Dr. Pérez Román, Cirujano Ortopeda de Arecibo, quien le inyectó el hombro derecho. Le hizo un diagnóstico de Capsulitis del hombro derecho. En junio de 2005 fue dada de alta de FSE. Historial pasado: Prolapso de válvula mitral, biopsia seno en mayo de 2002, histerectomía en mayo 2003, depresión emocional desde la fecha de su accidente, aumento en las enzimas del hígado. Examen físico: Mujer bien desarrollada, bien nutrida. Marcha normalmente. No está en distress. Viene sola a nuestras facilidades. Viste adecuadamente. Su brazo derecho en un cabestrillo. Región cervical: Movimientos normales. No hay espasmo muscular, deformidad ni áreas dolorosas. No hay adenopatías. Columna lumbosacral: La evaluada no hace ni el más mínimo esfuerzo por flexionar la columna cuando se le sugiere que lo haga. No hay espasmo muscular, deformidad o áreas dolorosas. Las pruebas de estiramiento del nervio ciático sentada, acostada y contra lateral negativas. Puede ponerse en cuclillas con facilidad. Caminar en el frente del pie y en los talones. Extremidades

superiores: Atrofia de ½ del brazo derecho. No hay atrofia de los brazos, antebrazos área tenar o hipotecar. No hay deformidades reumatológicas o post traumáticas. No hay del déficit del nervio mediano, ulnar o radial. Pruebas de Adson y Tinel negativas. Hay limitación en los movimientos del hombro activa y pasivamente según se indica en la gráfica que se acompaña. Con sus manos puede hacer una pinza, oponer el pulgar, hacer un puño con una fuerza 5/5. La fuerza de pinza 5/5. Extremidades inferiores: Atrofia de ½ del muslo izquierdo y la pantorrilla izquierda. No hay edema, enrojecimiento, aumento en calor o efusión de las rodillas. Ligamentos cruzados y colaterales estables. Fuerza muscular excelente. No hay inestabilidad. No hay déficit neurovascular. Neurológico: Reflejos musculotendinosos profundos fisiológicos. No hay clonus de los tobillos. Babinsky negativo. Placas de rayos x —tomadas en nuestras facilidades en esta fecha. Hombro derecho: Cicatriz de una fractura consolidada de la tuberosidad mayor del humero. Diagnóstico final: Fractura vieja consolidada de la Tuberosidad Mayor del Humero derecho. Capsulitis crónica del hombro derecho. Opinión: Se considera que la evaluada no está incapacitada para sentarse, caminar, levantar y llevar cargas, manejar objetos con su mano izquierda, oír, hablar y viajar. Con su mano derecha no puede levantar cargas pesadas. Pronóstico favorable. Su condición responde a tratamiento ortopédico que puede consistir en manipulación de articulación bajo anestesia.

20. MRI of the right shoulder 1-2-07: "Diagnostic impression: No abnormal marrow signal. No evidence of acute fracture or dislocation. There is minimal acromioclavicular joint hypertrophy without evidence of impingement. The tendons of the rotator cuff appear grossly intact. The anterior and posterior labri are grossly normal. The long head of the biceps tendon in is good anatomical position. Mild degenerative changes of the glenohumeral joint without acute bony abnormality. No evidence of rotator cuff tear".

21. MRI of the lumbosacral spine 1-2-07: "Diagnostic impression: Posterocentral disc bulge seen at L5-S1 indenting the proximal fibers of the right exiting nerve roots without evidence of impingement. Mild disc desiccation at L4-L5 and L5-S1."

22. MRI of the cervical spine 1-4-07: "Diagnostic impression: Right paracentral disc abnormality seen at C3-C4, and C4-C5 as describe above. No evidence of exiting nerve impingement. Scattered subcentimeter lymph nodes in the cervical chain bilaterally mostly likely reactive. Suspected chronic mocusal sinus disease in the sphenoid sinuses".

23. Revisión médica del expediente efectuada por el Dr. Vicente Sánchez Quiles, Asesor Médico de la ASR, del 1-23-07: Conclusión: Se determina que no cualifica para IO por criterios aplicables 1.05C, 10.08, 1.13, 1.12, 1.11, 10.14 ni ningún otro.

24. Estudio cardiovascular Instituto Cardiológico Arecibo 3-21-07: "Mitral valve: Prolapse of the anterior mitral leaflet. There is mild mitral regurgation."

25. Notas de progreso de la Dra. Lymarie I. Águila.

26. Notas de progreso del Dr. Rafael Delgado Cruz.

27. Resultado de Bilateral Diagnostic Mammography with CAD 9-27-07.

28. Notas de progreso de la Dra. Wanda I. Villanueva González.

29. CT of the knees 6-6-08: Findings: "There is mild narrowing of the medial knee joint compartment with mild sclerosis of the cortex on the medial femur and tibia. There is no lytic or sclerotic bone lesion. There is no abnormal soft tissue calcification. The patella is normal. There is no evidence of knee Joint effusion.

30. Notas de progreso Dr. García Moreno."

En lo referente a la condición emocional:

"1. Evaluación Inicial del Dr. Pablo A. Pérez Torrado, Psiquiatra, del 13 de mayo de 2004: Examen mental: Mujer de 48 años que aparenta su edad cronológica. Su postura es erecta y su marcha adecuada. Su apariencia es adecuada. Su vestimenta y calzados están limpios. Tiene buena higiene personal. No luce maquillaje ni adornos. Está peinada. Actitud de angustia. Luce cooperadora. Mantiene buen contacto visual. Atención y concentración están disminuidas. Su afecto está restringido y su estado de ánimo de angustia. Está en contacto con la realidad. No refirió fobias, obsesiones ni compulsiones. No hay evidencia de ideación suicida, homicida ni antisocial. No refirió delirios. No presenta delirios. Su memoria inmediata y reciente están disminuidas. La reciente pasada y remota están conservadas. Está orientada en tiempo, lugar y persona. Su juicio y auto conocimiento están adecuadamente conservados. Diagnóstico: Eje I: Trastorno depresivo mayor, recidivante grave, sin síntomas psicóticos. Farmacología: La paciente fue provista de receta médica conteniendo Effexor XL 150 mg. tab 1 am, Vistaril 50 mg. tab 1 pm y Mellaril 25 mgr. Tab. 1 hs. Recomendación: Se recomienda que la lesionada sea referida a tratamiento psicoterapéutico.

2. Notas de progreso del Dr. Armando Fortuño, Psiquiatra.

3. Certificado médico del Dr. Armando Fortuño, Psiquiatra, del 8-24-05: Se recomienda que la paciente continúe fuera del trabajo desde el 29 de julio de 2005 al 31 de diciembre de 2005.

4. Certificado médico del Dr. Armando Fortuño, Psiquiatra del 1-23-07: Se recomienda que Flor González continúe fuera del lugar de trabajo desde el 1ero. de enero de 2007 al 30 de junio de 2007.

5. Revisión médica del expediente efectuada por el Dr. Rafael Migue, Asesor Médico Psiquiatra de la ASR, del 26-4-07: "La condición emocional no alcanza ni iguala los criterios de severidad necesarios para cumplir con el listado 11.04 (trastorno afectivo) no cumple en A 2 y 3, no cumple en B 1, 2, 3, no cumple en C. Se recomienda denegar los beneficios.

6. Certificado médico del Dr. Armando Fortuño, Psiquiatra, del 6-17-08: Se recomienda que Flor González continúe fuera de su lugar de trabajo desde el 1ero. de julio de 2008 al 31 de diciembre de 2008."

Como se puede apreciar, el examen de los informes médicos desglosados anteriormente —junto con los demás documentos que obran en el expediente administrativo— le permitió, tanto a la Administración del Sistema de Retiro, como a la Junta de Síndicos, *evaluar longitudinalmente las condiciones médicas que padece la recurrente*. Las referidas agencias también tuvieron ante sí —en ocasión de las vistas celebradas en este caso—, el testimonio de la propia recurrente, lo cual les permitió apreciar de forma más clara su condición física y emocional. Finalmente, a pesar de que la señora González Serrano se le relacionaron al trabajo los accidentes de referencia, del récord también surge **que dicha parte no llena ni iguala los criterios de incapacidad del listado 1.05 C, así como tampoco, los del listado 1.12 correspondientes a las condiciones vertebrogénicas. Éstos requieren que la evidencia médica refleje la persistencia de los síntomas allí mencionados por lo menos durante tres meses, a pesar de estar bajo tratamiento, y que se espera duren por lo menos doce (12) meses consecutivos.**

En cuanto a su condición emocional, la paciente también fue evaluada y el resultado de tal evaluación fue que tampoco cumple con los criterios de incapacidad según el listado 11.04, correspondiente a trastornos afectivos. A esos fines, la resolución emitida hace una relación de los síntomas que se evalúan para arribar a su dictamen. Véase págs. 13 y 14 de la resolución recurrida.

La Junta de Síndicos, luego de evaluar la extensa evidencia, determinó que las **condiciones relacionadas al empleo** padecidas por la recurrente, no alcanzan un grado de severidad tal que la inhabilite para desempeñar las

funciones de su empleo *o de cualquier otro empleo remunerativo*. A la luz de lo anteriormente discutido, resolvemos que la determinación de la agencia recurrida está basada en evidencia sustancial que obra en el expediente administrativo. Por tanto, somos del criterio de que la recurrida no abusó de su discreción al confirmar la denegatoria de pensión decretada por la Administración de los Sistemas de Retiro.

Recapitulamos, del récord surge que la resolución emitida por la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura, aquí recurrida, está basada en evidencia sustancial que obra en el expediente administrativo. Dicha determinación se hizo luego de evaluar los informes periciales preparados, tanto por los médicos del Fondo del Seguro del Estado, como por los galenos con quienes se atiende la recurrente.

Es nuestro criterio que la agencia recurrida aplicó correctamente la Ley 447, *supra*, al resolver que la señora González Serrano no cumple con los criterios necesarios para recibir una pensión por incapacidad ocupacional. En consecuencia, determinamos que el error imputado por la recurrente en el recurso de autos no se cometió.

## III

Atendidos los fundamentos que hemos consignado, confirmamos la resolución recurrida.

Lo ordenó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones